UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| MARY ELIZABETH VANN, ) | |
| ) | |
| Plaintiff, ) | No. 4:17-cv-74 |
| v. ) | |
| ) | Mag. Judge Christopher H. Steger |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

**I.  Introduction**

This action was timely instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's final decision denying Mary Elizabeth Vann's ("Plaintiff") claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act.  Plaintiff seeks benefits on the basis of depression, anxiety, mood swings, a sleep disorder, migraine headaches, and degenerative arthritis in the neck. (Tr. 113-14, 274).  The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Sixth Circuit [Doc. 17].

Plaintiff's Motion for Judgment on the Pleadings [Doc. 18] and Defendant's Motion for Summary Judgment [Doc. 22] are before the Court.  For the reasons stated in this memorandum opinion, the Court will **AFFIRM** the Commissioner's decision, **DENY** Plaintiff's motion [Doc. 18] and **GRANT** the Commissioner's motion [Doc. 22].

## II. Background

### A. Procedural History

On January 2, 2014, Plaintiff applied for disability insurance benefits and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-434, 1381-1385 (Tr. 23, 227-29, 233-38). Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), provide for judicial review of a "final decision" of the Commissioner of the Social Security Administration ("SSA"). Plaintiff's claims were denied initially and on reconsideration (Tr. 139-40, 142-43). On December 7, 2016, following a hearing, an administrative law judge ("ALJ") found Plaintiff not under a "disability" as defined in the Act (Tr. 23-27). On October 2, 2017, the Appeals Council denied Plaintiff's request for review. (Tr. 1-5). Thus, Plaintiff has exhausted her administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner subject to judicial review.

### B. Relevant Facts

#### 1. Age, Education, and Past Relevant Work

Plaintiff, age 45 when the ALJ issued her decision, has a 12th grade education. (Tr. 36). She was born in 1970 and alleged that she became disabled beginning January 2, 2014 (Tr. 23, 47). Plaintiff's past work includes a nursing assistant, which the Vocational Expert ("VE") categorized as a medium exertion job; a self-employed worker, sealing parking lots and driveways, which the VE categorized as a general laborer; a spray painter job; and a bidder/estimator job, which the VE categorized as administrative clerk. (Tr. 59-60).

#### 2. The ALJ's Findings

The ALJ made the following findings in her December 7, 2016, decision:

- Plaintiff met the insured status requirements of the Social Security Act through March 31, 2016. Plaintiff had not engaged in substantial gainful activity since January 2, 2014, the amended alleged onset date. (Tr. 25).

- Plaintiff has severe impairments of cervical degenerative disc disease status-post cervical discectomy, lumbar degenerative disc disease, migraine headaches, carpal tunnel syndrome status-post release, dysfunction of the right upper extremity, major depressive disorder, anxiety disorder, and substance addiction. (Tr. 26).

- Plaintiff's impairments do not meet a Listing. (Tr. 26).

- Plaintiff cannot perform her past relevant work. (Tr. 35). She retains the residual functional capacity to perform *sedentary* work, with the following limitations:

    - can understand, remember, and carry out simple and routine instructions; can make work-related judgements typically required for unskilled work; can respond appropriately to supervision, coworkers, and work situations; can have contact with the general public on a rare basis; can have contact with supervisors and coworkers on an occasional and superficial basis; works better with things rather than people; and can deal with changes in a routine work setting on an infrequent and gradual basis.

    - needs to stand and stretch at her workstation at 30-minute intervals and resume sitting;

    - can occasionally climb ramps and stairs; can occasionally balance, kneel, stoop, crouch, or crawl; can never climb ladders, ropes, or scaffolds or work unprotected heights or with dangerous machinery;

    - is limited to frequent reaching in the front overhead with the right upper extremity; is limited to occasional pushing and pulling with the right upper extremity;

    - is limited to frequent bilateral handling and fingering. (Tr. 28).

- Plaintiff can work other jobs within the national economy including table worker, inspector/checker, and weight tester (Tr. 37). All of these jobs are sedentary, unskilled work which meet her RFC. (Tr. 37). Plaintiff is not disabled. (Tr. 37).

### 3. Relevant Medical History

In her Disability Report, Plaintiff alleged disability due to depression, anxiety, sleep disorder, mood swings, arthritis in her neck, and migraine headaches. (Tr. 274). The relevant time period for consideration of Plaintiff's Title II claim is from January 2, 2014, the amended alleged

onset date of disability, until March 31, 2016, the date her insured status expired.

On January 3, 2014, the day after her alleged onset date, Plaintiff presented to the emergency room with the "worst headache of her life." (Tr. 546). She appeared in no acute distress despite rating her pain as 9 out of 10. (Tr. 546). She exhibited a normal gait, equal grip strength, and full ranges of motion. (Tr. 548, 553-54). A January 8, 2014, lumbar x-ray showed narrowing of the L3-5 disc spaces with small osteophyte formations. (Tr. 557). The next day a physical examination revealed no abnormalities in her extremities. (Tr. 405).

Plaintiff again demonstrated no abnormalities in her extremities on February 7, 2014. (Tr. 404). A week later, Plaintiff returned to the emergency room with the "worst headache of her life." (Tr. 568). She rated her pain as 9 out of 10 but appeared in no acute distress though she looked "uncomfortable" and "anxious." (Tr. 568-69). She exhibited no musculoskeletal deficits, a normal gait, and equal grip strength. (Tr. 570, 575-76). A follow-up appointment in March 2014 with her primary care provider revealed normal neurological and extremity examinations. (Tr. 403). On March 31, 2014, a head CT was ordered for her frequent migraine headaches, and it was normal. (Tr. 579). On April 2014, Plaintiff denied any headaches since her March 2014 appointment. (Tr. 402). Her extremities were normal. (Tr. 402).

Plaintiff returned to the emergency room on May 3, 2014, with a migraine headache (Tr. 581). She rated her pain as 10 out of 10. (Tr. 542, 584). She had normal gait and intact motor and sensory examinations. (Tr. 587). A week later, Plaintiff saw her primary care provider for medication refill. (Tr. 401). Her extremities were normal, but she had tender lumbar paravertebral muscles. (Tr. 401).

On August 2, 2014, Plaintiff presented to the emergency room with the "worst headache of her life." (Tr. 590). She had a normal gait, equal grip strength, intact sensations, and adequate

range of motion. (Tr. 590, 597). On September 4, 2014, Plaintiff saw her primary care provider for neck and back pain (Tr. 446). She described right wrist pain, numbness, and tingling (Tr. 446).

On September 10, 2014, Robert Beasley, M.D., performed a right carpal tunnel release. (Tr. 459-60). Twelve days later, Plaintiff reported that the release relieved her symptoms. (Tr. 453). The treatment note specifically states, "[s]he is relieved of her carpal tunnel symptoms." (Tr. 453).

In October 2014, Plaintiff told her primary care provider that her pain medications were working well for her neck and back pain. (Tr. 445). She also admitted to Dr. Beasley that she had no problems. (Tr. 454). She had returned to work for a couple of weeks without restrictions (Tr. 454).

In November 2014, Plaintiff went to the emergency room with the "worst headache of life [sic]." (Tr. 612). She had a normal gait and full ranges of motion in her neck. (Tr. 619). Plaintiff also returned to the emergency room in January 2015 and February 2015 with migraine headaches. (Tr. 622, 635). She had a normal gait and full range of motion in her neck. (Tr. 624, 629, 641-42).

An April 2015 lumbar x-ray showed mild degenerative change more prominent at L4-5 with minimal degenerative spondylolisthesis of L4 on L5 and minimal side bending to the left. (Tr. 645). A July 2015 lumbar MRI demonstrated spinal canal stenosis, dehydration, and desiccation at the L3-5 levels; and narrowing of L3-4 bony neural foramina due to the bulging L3-5 disc material. (Tr. 654-55). Following the MRI, Amy Becton, P.A.-C., saw Plaintiff on August 3, 2015, for low back pain/spinal stenosis. (Tr. 754). Ms. Becton examined Plaintiff's lumbar spine and noted that Plaintiff had no weakness there despite the MRI findings. (Tr. 754). She appeared in no acute distress. She exhibited an antalgic gait and station, paraspinal tenderness, negative straight leg raising testing, full leg strength, and intact sensation. (Tr. 755). On August 12, 2015, Plaintiff then underwent a lumbar epidural steroid injection. (Tr. 764, 770).

Plaintiff followed up with Sanat Dixit, M.D., after the epidural injection on August 31, 2015 (Tr. 752). Plaintiff had no significant relief from the injection (Tr. 752). She reported right hand tingling and weakness with "a noticeable loss of fine motor coordination in her hands (cannot thread a needle or secure buttons." (Tr. 752). Plaintiff had a mildly restricted lumbar extension, negative straight leg raising testing, and full strength in both of her legs. (Tr. 752). She exhibited reduced left biceps and handgrip strength (4-4+/5). (Tr. 753). She was positive for Tinel's sign and left supraclavicular fossa. (Tr. 753). Similar results were noted in later exams dated September 21, 2015 and October 12, 2015. (Tr. 748, 750-51).

Dr. Dixit on September 21, 2015, recommended surgical intervention (Tr. 750). A cervical MRI showed C4-5 disc protrusion with mild central canal stenosis, C5-6 degenerative disc changes with diffuse disc protrusion, C6-7 central disc protrusion, and C6-T1 mild disc protrusion. (Tr. 765). A cervical x-ray revealed degenerative changes at C5-7 (Tr. 767).

In October 2015, Plaintiff complained of shoulder joint pain. (Tr. 669). It was noted, "no weak limbs; no tingling; no numbness of the legs/feet." (Tr. 671). She had a normal gait. (Tr. 671). Plaintiff underwent a cervical discectomy later that month with implantation of hardware. (Tr. 758-62).

Plaintiff returned to Ms. Becton after the discectomy on November 16, 2015. (Tr. 745). She reported overall improvement in balance, weakness, and numbness. (Tr. 745-46). She had full strength and intact sensations. (Tr. 745). Cervical x-rays showed post-surgical changes. (Tr. 745). A week later, Plaintiff told her primary care provider that she was doing okay following her surgery. (Tr. 675). She had a normal gait (Tr. 675). The provider referred Plaintiff to an orthopedist for left elbow pain. (Tr. 676).

Dr. Beasley saw Plaintiff in December 2015 for left tennis elbow. (Tr. 656). The doctor

provided an injection and, in January 2016, Plaintiff admitted that the left elbow pain was "essentially recovered." (Tr. 661).

Also in December 2015, Plaintiff reported sharp pain in her neck and spine. (Tr. 680). She told her primary care provider that her pain improved with medications and that she was doing okay after her surgery. (Tr. 680). She appeared in no acute distress with a normal gait. (Tr. 680). In January 2016, Plaintiff continued to report pain in neck and spine but also reported that medications worked well. (Tr. 685). She appeared in no acute distress with a normal gait. (Tr. 685).

Plaintiff followed up with Dr. Dixit in February 2016 and reported improvement in pain after an SI joint injection though she was still experiencing pain in her SI joint. (Tr. 743). She appeared in no acute distress. (Tr. 743). Plaintiff had a normal gait and station. Cervical examination showed normal ranges of motion, full strength, and negative straight leg raising testing. (Tr. 744). Plaintiff denied any tingling, numbness, or weakness (Tr. 744). A cervical x-ray showed post-surgical changes. (Tr. 744). Later that month, following a positive drug screen, Plaintiff's primary care provider advised her that, if she failed another drug screen, her treatment would be terminated. (Tr. 691).

In March 2016, Plaintiff told Dr. Dixit that she continued to receive pain relief from steroid injections in the SI joint. (Tr. 741). She appeared in no acute distress and denied any tingling, numbness, or weakness. (Tr. 741-42). She exhibited a normal gait and station and intact motor and sensory examinations. (Tr. 742).

Plaintiff saw her primary care provider in March 2016, April 2016, and May 2016 for medication refills. (Tr. 693, 698, 703). She reported that the medications were working well for neck and back pain. (Tr. 695, 700, 705). Plaintiff had a normal gait and appeared in no acute

distress. (Tr. 695, 701, 706). Plaintiff told Dr. Beasley in May 2016 that her left elbow pain did well with injections (Tr. 663, 665).

In June 2016, Plaintiff returned to Dr. Dixit and denied any radiating pain but requested a repeat SI joint injection for pain in the right SI joint and left side of the neck. (Tr. 739). She appeared in no acute distress and denied tingling, numbness, or weakness. (Tr. 739-40). She exhibited a normal gait and station and mildly restricted neck range of motion. Cervical examination showed full strength and intact sensation. (Tr. 740). Cervical x-rays showed stable hardware at C4-7 with evidence of some fusion at C5-7. (Tr. 740).

Plaintiff presented to the emergency room in July 2016 with a headache after falling down stairs. (Tr. 780). She appeared in no acute distress and exhibited full ranges of motion, and normal motor and sensory examinations. (Tr. 781). A cervical CT revealed cervical fusion hardware at C3, C4-5, and C6. (Tr. 787). She subsequently followed up with Dr. Dixit but denied any neck pain. (Tr. 773). On August 17, 2016, she denied any recurrence of preoperative hand numbness or tingling (Tr. 773-74). She had full strength in her arms. (Tr. 773). A cervical x-ray showed no evidence of hardware migration or failure. (Tr. 774).

In August 2016, Plaintiff returned to the emergency room with a headache. (Tr. 791). She rated her pain as 8 out of 10 but appeared in no acute distress. (Tr. 791). She had a normal gait, full ranges of motion, and normal strength. (Tr. 795).

    **4.**  **Medical Opinions**

On July 24, 2014, Jerry Campbell, Jr., Psy.D. performed a consultative evaluation of Plaintiff. (Tr. 435-39). Plaintiff appeared alert and oriented with good eye contact, normal speech, and a clear and logical thought process. (Tr. 437). She wore a brace on her right wrist. (Tr. 435). Dr. Campbell opined that Plaintiff had mild impairments in her short-term memory and ability to

sustain concentration; and moderate impairments in socially relating and adapting to changes. (Tr. 439).

Five days later in July 2014, Terrence Leveck, M.D., performed a consultative examination of Plaintiff. (Tr. 440-43). Plaintiff appeared alert and in no acute distress. (Tr. 441). She had full strength except for reduced right hand grip (4/5), normal sensation, and decreased cervical, lumbar, right shoulder, and right wrist ranges of motion. (Tr. 441-42). Hip straight leg raising caused mild low back pain. (Tr. 442). She had mild difficulty with heel walking and moderate difficulty with toe walking (Tr. 442). Plaintiff reported a two-month history of waking with tingling in her entire right hand; Dr. Leveck noted she was diagnosed with carpal tunnel syndrome and fitted with wrists splints which she wore every night and periodically in the day when her wrists started to bother her. (Tr. 440). Tinel's test caused local discomfort in the ventral right wrist. (Tr. 442). Pinch strength was normal bilaterally. (Tr. 442). Dr. Leveck opined that Plaintiff could sit for 8 hours, stand and walk for 8 hours, and lift and carry 5 pounds frequently and 10 pounds occasionally; and her fine motor function might be "somewhat impaired" due to mild weakness in the grip of her right hand due to carpal tunnel syndrome. (Tr. 443).

State agency medical consultants reviewed the medical records. In August 2014, Edward Sachs, Ph.D., reviewed the medical records and found that Plaintiff could interact infrequently with the general public and adapt to gradual or infrequent changes. (Tr. 88-90, 93-95). Later in August 2014, Charles Settle, M.D., reviewed the record and opined that Plaintiff could perform medium work with frequent handling and reaching with her right arm and occasionally pushing and pulling with her right arm (Tr. 91-93). In December 2014, Andrew Phay, Ph.D., reviewed the updated record and affirmed Dr. Sachs' opinion. (Tr. 74-75, 79-80). Also in December 2014, Thomas Thrush, M.D., reviewed the updated record and opined that Plaintiff could perform a range

of medium work with frequent reaching and no limitations in handling, fingering, or feeling (Tr. 76-79).

## III. Discussion

### A. Standard of Review

The determination of disability under the Act is an administrative decision. To establish disability under the Social Security Act, a claimant must establish she is unable to engage in any substantial gainful activity due to the existence of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. §§ 404.1520; 416.920. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity she is not disabled; (2) if the claimant does not have a severe impairment she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment she is disabled; (4) if the claimant is capable of returning to work she has done in the past she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. §§ 404.1520; 416.920; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a *prima facie* case that she cannot return to her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which she can perform considering her age, education and work experience. *Richardson v. Sec'y of Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner made any legal errors in the process of reaching the decision. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (adopting and defining substantial evidence standard in the context of Social Security cases); *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.*, 790 F.2d 450 n.4 (6th Cir. 1986).

The court may consider any evidence in the record, regardless of whether the ALJ cited it. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). However, for purposes of substantial evidence review, the court may not consider any evidence that was not before the ALJ. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the Court is not obligated to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-cv-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,'" *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

B.     Analysis

Plaintiff argues that the ALJ's decision is unsupported by substantial evidence because the record as a whole does not support a finding that Plaintiff can engage in *frequent* bilateral handling and fingering and *frequent* reaching with the upper right extremity only.[1] As Plaintiff accurately observes, the jobs identified by the VE require that Plaintiff be able engage in *frequent* bilateral handling and fingering and *frequent* reaching with the upper right extremity only. (*See* VE testimony, Tr. 61-2). According to Plaintiff, ["t]his limitation is an overstatement of Plaintiff's ability to perform such a function and is only supported by outdated opinions from physicians who have never even treated or examined Plaintiff." (Doc. 19, Plaintiff's brief at 8). Thus, Plaintiff argues, she is able to engage in these functions only *occasionally* and "a limitation to *occasional* handling, fingering, and feeling could very well be dispositive of disability."[2] *Id.* at 11 (emphasis added). According to Plaintiff, the ALJ failed to consider the evidence as a whole, looking only at that evidence which supported the ALJ's RFC determination for Plaintiff. Plaintiff seeks remand to determine whether Plaintiff is disabled if she is limited to *occasional* reaching, handling, fingering, and feeling.

The medical evidence, including the opinion evidence, indicates Plaintiff was significantly limited in her ability to reach with her right arm and to finger and handle with her right hand prior to her successful carpal tunnel surgery on September 10, 2014. Twelve days later, however, she reported being relieved of her carpal tunnel symptoms. Then in August of 2015, she reported to Dr. Dixit right hand weakness and tingling in her right hand with a noticeable loss of fine motor

---

[1] "'Frequent' means occurring from one-third to two-thirds of the time" in an eight-hour work day. SSR 83-10, 1983 WL 31251, at *6, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK -- THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2.
[2] "'Occasionally' means occurring from very little up to one-third of the time" in an eight-hour work day. SSR 83-10, 1983 WL 31251, at *5.

coordination in her hands, but Dr. Dixit found hand grip strength was only slightly diminished. In October of 2015, she underwent a successful cervical discectomy and later reported overall improvement in her condition. While she had left elbow issues in December 2015, her right-hand issues continued to resolve. She continued to visit Dr. Dixit on several occasions after the cervical discectomy, and she consistently denied numbness, tingling or weakness. In addition, there are no reports of further issues with her right hand or arm in these visits to Dr. Dixit. To the contrary, on August 17, 2016, she specifically denied any recurrence of her preoperative hand numbness or tingling and Dr. Dixit found she had full strength in both arms.

The Court notes that Dr. Levek's opinion, which was more restrictive than the RFC assigned by the ALJ, was given in July 2014, before Plaintiff's surgery for carpal tunnel syndrome and her cervical discectomy. Given that the medical record shows substantial improvement in her right arm and hand following her two surgeries, the Court concludes, substantial evidence exists to support the ALJ's finding that Plaintiff can engage in frequent bilateral handling and fingering and frequent reaching with the upper right extremity only.

IV. **Conclusion**

For the reasons stated in this Memorandum Opinion, the Court concludes substantial evidence exists to support the ALJ's decision denying Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income, as provided by the Social Security Act. Therefore, the Court will **DENY** Plaintiff's Motion for Judgment on the Pleadings, **GRANT** the Commissioner's Motion for Summary Judgment, and **AFFIRM** the Commissioner's decision.

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE